THOMAS F. CASEY III, COUNTY COUNSEL (SBN 47562)
By: John D. Nibbelin, Deputy (SBN 184603)
By: Kathryn E. Alberti, Deputy (SBN 172034)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA  94063
Telephone: (650) 363-4647
Facsimile:  (650) 363-4034
E-mail:  kalberti@co.sanmateo.ca.us

Attorneys for Defendant
SEQUOIA UNION HIGH SCHOOL DISTRICT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH Z., <br><br> Plaintiff, <br><br> vs. <br><br> SEQUOIA UNION HIGH SCHOOL DISTRICT, <br><br> Defendant. | Case No. 07-2389 SI <br><br> **DECLARATION OF KATHRYN E. ALBERTI IN SUPPORT OF DEFENDANTS MOTION TO DISMISS PURSUANT TO RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE** <br><br> Hearing: <br><br> Date:      November 30, 2007 <br> Time:     9:00 a.m. <br> Dept:     Law & Motion <br><br> (Judge Susan Illston) |

I, KATHRYN E. ALBERTI, declare as follows:

1.      I am a Deputy County Counsel for the County of San Mateo, representing the Defendants in this matter, Sequoia Union High School District and the individual Defendants Patrick Gemma, Nikki Washington, Cliff Alire, Karen McGee and Marion Welch.  The following is within my personal knowledge, and if called as a witness, I could and would testify competently thereto.

4.      Attached hereto as Exhibit A is a true and correct copy of the Administrative Law Judge's Decision from the Office of Administrative Hearings dated February 23, 2007.

5.      Attached hereto as Exhibit B is a true and correct copy of the Administrative Law Judge's

1  Decision from the Office of Administrative Hearings dated July 30, 2006.

2          6.      Attached hereto as Exhibit C is a true and correct copy of the first amended complaint in

3  this action.

4          I declare under the penalty of perjury under the laws of the State of California that the foregoing

5  is true and correct.  Executed this 11th day of September 2007, at Redwood City, California.

6

7  Dated:  September 11, 2007                    THOMAS F. CASEY III, COUNTY COUNSEL

8

9                                                By: _____/s/_____

10                                                    Kathryn E. Alberti, Deputy

11                                               Attorneys for Defendant
                                                 SEQUOIA UNION HIGH SCHOOL DISTRICT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KATHRYN E. ALBERTI IN SUPPORT OF DEFENDANTS MOTION TO DISMISS
PURSUANT TO RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

**EXHIBIT A**

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

                Petitioner,

v.

SEQUOIA UNION HIGH SCHOOL
DISTRICT,

                Respondent.

OAH CASE NO. N2006120087

## DECISION

    Administrative Law Judge (ALJ), Charles Marson, Office of Administrative Hearings (OAH), Special Education Division, State of California, heard this matter on February 1, 2007, in Woodside, California.

    Petitioner's mother (Mother) represented Petitioner (Student). David Nibbelin, Attorney at Law, and Marian Watson, Paralegal, represented Respondent Sequoia Union High School District (District).

    Mother and Nikki Washington, the District's Chief Administrator of Special Education, were present throughout the hearing.

    The request for due process hearing was filed on December 4, 2006. There was no continuance before the hearing. At the hearing, oral and documentary evidence were received. Student waived closing argument. At the District's request, the matter was continued and the record held open until February 8, 2007, when the District filed a closing brief and the matter was submitted.

ISSUES

1.    Did the District deny Student a Free Appropriate Public Education (FAPE) during the school years (SY) 2005-2006 and 2006-2007[1] by any of the following:

   a)    Failing to provide Student individual tutoring in mathematics (math) and science;

   b)    Failing to include a behavior intervention plan in Student's IEP offers;

   c)    Failing to allow Student to retake tests on which she originally received a D or an F;

   d)    Failing to allow Student to make up missed and late homework and assignments;

   e)    Failing to include in IEP offers, to consider, and to respond to the concerns of Parents;

   f)    Failing to include in IEP offers a transition plan for Student;

   g)    Failing to state in IEP offers the beginning dates, frequency, and duration of services; and

   h)    Failing to designate an IEP offer as the triennial IEP offer?

2.    Is Student entitled, as relief, to the provision of:

   a)    Individual tutoring in math and science;

   b)    A review at District expense of a behavioral intervention plan by Dr. Frank Marone, and compliance with whatever revised plan Dr. Marone recommends;

   c)    The opportunities to retake tests on which she originally received a D or an F, and to turn in late or missing homework and assignments;

   d)    An opportunity to make up lost academic credits in summer school; and

   e)    Placement in a private school at public expense if Student does not progress academically, or if the District fails to follow the revised behavior intervention plan, calls police about Student, or wrongly suspends or expels Student?

CONTENTIONS OF THE PARTIES

Student, who receives poor grades in most subjects, contends that those grades are caused by the District's failure to provide to her individual tutoring in math and science, and a behavior intervention plan. She also contends that the District committed procedural violations of the Individuals with Disabilities in Education Act (IDEA) by failing to offer her a transition plan; by failing to state in IEP offers the beginning dates, frequency, and duration of offered services; and by failing to designate an IEP offer as her triennial plan.

---

[1]The request for due process hearing addresses the entire SY 2005-2006 and the SY 2006-2007 up to November 13, 2006.

Student argues that the District's conduct denied her a FAPE and entitles her to various forms of relief, including individual tutoring in math and science, adoption of a specific behavior intervention plan to be revised by a named private behaviorist, opportunities to retake tests and resubmit late or missing homework and assignments, and, under certain circumstances, reimbursement for future expenses to be incurred in attending private school.

The District contends that Student's arguments are factually incorrect, and that it has offered and provided to her a FAPE. The District argues that Student's poor academic performance results not from any disability or flaw in her program, but from her inattention and misbehavior in class; that Student has had ample tutoring available but will not take advantage of it; that she does not require a behavior intervention plan; and that her parents (Parents) have frustrated its efforts to create a behavior support plan by refusing to allow Student to participate in its development. The District also contends that Student has been given many opportunities to retake tests and resubmit homework and assignments, but has rarely done so. Finally, the District argues that Parents have frustrated its efforts to improve Student's grades and behavior by refusing to agree to any IEP the District has offered.

## FACTUAL FINDINGS

*Background*

1.     Student, a 15-year-old female, resides with Parents within the District, and is eligible for special education because of a speech and language impairment. She is in the 10th grade at the District's Woodside High School (Woodside).

*Student's Unique Needs*

2.     A school district must adequately address all the unique needs of a student eligible for special education for any reason.

3.     Student has impaired speech and language skills and organizational deficits that diminish her academic performance. She misbehaves in class to the detriment of her education. However, Student is generally quite capable, and in some ways outstanding. Her ability to understand and express herself verbally is high. She has no cognitive processing or specific learning disorder. Her academic and functional skills are at grade level. Her gross and fine motor development, and her social and emotional development, are age appropriate. Her academic skills range from average to high average. She plays the violin, composes music, is skilled at fencing, and is a gifted graphic artist.

*The District's Offers of Placement and Services*

4.     A school district must offer a student eligible for special education an IEP that is reasonably calculated to afford her some educational benefit.

3

*The IEP from Hillview Middle School in Menlo Park*

5.    The last IEP to which Parents agreed was developed on March 5, 2004, while Student was in the seventh grade at Hillview Middle School (Hillview) in the Menlo Park City School District. That IEP placed her in a regular classroom and provided her 30 minutes a month of speech therapy consultation.[2]

6.    When Student entered Woodside as a ninth grader in 2005, the parties could not agree on an IEP, and the District continued to use the March 5, 2004 Hillview IEP as Student's program. It is still the last agreed-upon and implemented IEP.

*The January 26, 2006 IEP offer*

7.    In December 2005, and early January 2006, the District conducted its triennial assessments of Student, which are described in detail in *Sequoia Union High School District v. Student, supra.*

8.    In preparation for the triennial IEP meeting scheduled for January 26, 2006, the District faxed to Mother[3] a draft IEP, soliciting suggestions for certain provisions. The parties did not reach agreement on January 26, and on February 22 Mother faxed to the District a letter dissenting from most of the District's recommendations. The IEP team held additional meetings on February 23 and March 2. The final product of those meetings, which was faxed to Mother on March 3, 2006, is referred to herein as the January 26, 2006 IEP offer.

9.    In the January 26, 2006 IEP offer, the District proposed to continue the 30 minutes a month of speech therapy consultation Student was receiving, and to continue her placement in regular classes, except for one period a day in the Resource Specialist Program (RSP) for individual assistance in organizational skills and the completion of homework. The District also asked that Mother consent to a mental health assessment. Mother refused to sign the proposed IEP or consent to the assessment, and the March 5, 2004 IEP from Hillview continued in effect.

*The November 3, 2006 IEP Offer*

10.    At an IEP meeting on November 3, 2006, the District offered Student a program that was substantially the same as the program offered her in January. Because of

---

[2] Official notice is taken of two previous due process proceedings involving Student. In *Student v. Menlo Park City School District*, OAH Case No. N2005090654, Administrative Law Judge (ALJ) Richard Clark ruled on April 4, 2006, that the respondent District provided a FAPE to Student during the school year 2004-2005. In *Sequoia Union High School District v. Student*, OAH Case No. 2006050687, ALJ Debra Huston ruled on July 30, 2006, that this District's triennial assessments of Student were appropriate. Some of the facts stated herein are drawn from those decisions.

[3] Student's father was not involved in the events described here.

Student's increasing behavioral difficulties, the District requested that Mother consent to a mental health assessment and a functional analysis assessment (FAA). Again the parties could not agree, and on November 13, 2006, Mother faxed another letter of dissent to the District. Mother refused to sign the proposed IEP or consent to the mental health referral or the FAA. The March 5, 2004 IEP from Hillview continued in effect.

*Student's grades*

11.    Student's grades in SY 2005-2006 were low. They improved slightly between December 2005, and June 2006, in English (D- to C-), Geometry (F to D-), physical education (C to B), and Advanced Integrated Science (C to C+). They remained the same in Fine Arts (D) and French (C). They worsened in World Studies (B to D).

12.    As set forth below, Student's poor grades in the SY 2005-2006 did not result from any flaw in the District's IEP offers or in its delivery of curriculum to Student. They were caused by Student's failure to seek out available tutoring, her inattention and misbehavior in class, her failure to retake tests and to turn in homework and assignments, and by Mother's failure to agree to any IEP proposal.[4]

*Individual tutoring*

13.    Student does not use her low grades to criticize the Hillview IEP under which she received them. Instead, Student contends, but did not prove, that her grades demonstrated a need for the inclusion, in the IEP offers of January 26 and November 3, 2006, of individual tutoring in math and science.[5] However, Student offered no evidence that, in order to benefit educationally, she required such tutoring, or that her grades in math and science were related to any lack of tutoring.

14.    Student's low grades in Geometry were primarily caused by her lack of sufficient background in algebra. As her geometry teacher Aaron Campbell testified, most ninth graders at Woodside take Algebra I, not Geometry. However, at Parents' insistence, Student was placed in Geometry in the ninth grade without having taken Algebra I. Campbell testified without contradiction that, as a result, Student simply lacked the foundation in algebra to understand geometry. Marian Welch, Student's speech and language therapist, testified that Student had taken, but not passed, pre-algebra work in eighth grade.

---

[4] Student alleges that she did not make sufficient progress under a specific academic goal in the January 26, 2006 IEP offer. However, the District was under no obligation to measure Student's progress against that goal because it was part of an IEP offer that Mother rejected. Moreover, the goal was proposed on the assumption that Student would receive one period a day of tutoring from the RSP teacher in study skills and homework completion, which she did not.

[5] Student does not challenge the adequacy of her speech and language therapy.

15.     Student's science teacher Ernest Lo testified that the main reason Student did poorly in science was that she did not turn in her work.  There was no contrary evidence.

16.     Even if Student had required individual tutoring in math and science, she had ample opportunity to get it.  At all relevant times, Woodside had an extensive program of tutoring for all its students.  Any student who did not understand something was offered tutoring assistance, and any student who asked for tutoring assistance got it.  Certificated teachers, some of them math and science teachers, offered tutoring in the school's library Mondays through Thursdays after class.  Some of the tutoring in the library was individual; some was in small groups.  There was no evidence that Student would not benefit from small group tutoring any less than from individual tutoring.

17.     All of Student's teachers offered their students individual tutoring after classroom hours.  Student's science teacher Lo testified that the science and math departments gave tutoring assistance to any student who desired it, and that during the SY 2005-2006 he announced in class to all his students that he was available at lunch, during seventh period, and after school to give any of them individual assistance.  He spoke separately to Student, offering to help her individually after school, but she only came in for that help approximately five times during the year.  Lo also communicated his availability for science tutoring to Parents by email.

18.     Student's geometry teacher Campbell testified that math tutoring was available to all students immediately after school in the library.  Math teachers were present in the library at least twice a week.  And on Tuesday and Thursday evenings, from 5:30 p.m. to 7:30 p.m, two math teachers were available for math tutoring in classrooms.  A schedule for the evening tutoring sessions was posted in all classrooms.  The schedule advised students to "[s]ee your own math teacher for individual help."  The District attached this schedule to its January 26, 2006 IEP offer.  The availability of math tutoring was communicated to Student in class and personally, and to Mother by email.  Campbell testified that Student took advantage of these math tutoring opportunities only once or twice during SY 2005-2006.

19.     Woodside's tutoring program was part of its regular, not special, education curriculum, and therefore was not a required element of an IEP offer.  Nonetheless, the availability of that tutoring was communicated to Mother at IEP meetings, and was contained in the January 26, 2006 IEP offer.

20.     There was no evidence that the availability of tutoring in the regular education program, instead of the special education program, made any difference in its usefulness to Student.  Tutoring did not substantially aid Student in science and math because she did not take significant advantage of the tutoring opportunities she knew she had.

*Behavioral Intervention Plan*

22.     Student's low grades resulted in part from her inattention and misbehavior in class.  She frequently sketched or read Japanese comic books when she should have been

6

paying attention. During the SY 2005-2006, Student occasionally disrupted her English class. For example, on one occasion she broke a pen hard enough that pieces of it hit the teacher and another student. On another, during a silent reading period, she did homework, and when criticized for that, vocally challenged the teacher, saying (incorrectly) that she had a right to do homework then. Student used profanity at inappropriate moments, and sometimes had difficulty maintaining social relations with her peers.

23.    Student's behavioral difficulties are not thoroughly documented, in part because the District honored Mother's request not to interview Student on the subject. There is a line on the January 26, 2006 IEP form asking: "Does student's behavior impede learning of self or others?" The question is not answered. Instead there is a notation that the question is "not answered per parent request."

24.    The District did what it could to understand Student's behavioral difficulties. In the January 26, 2006 IEP offer, in a separate document sent to Mother on March 20, and as part of the November 3 IEP offer, the District requested that Mother permit a referral of Student to San Mateo County Mental Health Services for a mental health assessment. On each occasion Mother declined to consent. In the November 3 IEP offer, the District also requested that Mother consent to a functional analysis assessment (FAA), a common method of exploring behavioral difficulties. Again Mother declined.

25.    It was the District's practice to develop a behavior support plan only in collaboration with the student, but Mother declined to allow Student to participate in that process. The District was therefore unable to develop a behavior support plan.

26.    Although the District wanted to develop a behavioral support plan, Student did not prove that such a plan was required in order to provide her a FAPE, or that her behavior could not be adequately controlled in the absence of such a plan.

27.    At all IEP meetings in 2006, Mother advocated the adoption of a proposal written by a private behaviorist, Dr. Frank Marone. That proposal was described at hearing as a behavioral intervention plan, but there is nothing in the record to show whether the proposal was preceded by an FAA or adopted or implemented by any school according to the procedures required by law. The parties agree that the proposal was outdated. Mother urged the District to adopt Dr. Marone's proposal subject to his review and alteration of it. The District declined. Student did not prove that Dr. Marone's proposal had any merit, or that the proposal, if revised and adopted, would have made any difference in her behavior.

28.    Student did not prove that addressing her misbehavior required a behavior intervention plan. There was no evidence that she exhibited a serious behavior problem that significantly interfered with the implementation of the goals and objectives of her IEP, that was self-injurious or assaultive, that caused serious property damage, or that was pervasive and maladaptive and not effectively controlled by the instructional and behavioral approaches specified in her IEP or otherwise followed by the District.

*Retaking D and F tests*

29.     Student did not prove that, in order to benefit educationally, she required the opportunity to retake tests on which she originally received a D or an F.   However, the parties viewed that opportunity as appropriate for inclusion in Student's IEP.   The January 26, 2006 and November 3, 2006 IEP offers both proposed that Student be given the opportunity to retake D and F tests until she received a C.  Mother's letters dissenting from both offers purported to accept those portions of the offers.

30.     At all relevant times, the District offered Student the opportunity to retake any test on which she received a D or an F, but Student rarely chose to do so.  Karen McGee, a school psychologist who recently assessed Student, testified that all of Student's ninth grade teachers were asked to allow her to retake D and F tests, and all complied.  Student's science teacher, Lo testified that he had been informed that Student should have the opportunity to retake those tests, and he told her that she could, but she never attempted to do so.  Student's geometry teacher, Campbell testified that it was the policy of the math department that any student could retake a D or F test.  That policy was communicated to all geometry students in the course description.  Campbell individually reminded Student of the policy, and communicated the policy to Mother by email.  Student retook at least one geometry test, and arranged to retake at least one more, but did not show up for the test.

31.     To the extent that Student's grades were low because she received Ds or Fs on some tests, those grades either reflected Student's choice not to retake most of the tests, or incorporated Student's low scores on the tests she retook.

*Making up late or uncompleted homework and assignments*

32.     Student did not prove that she required special accommodations in completing and turning in her homework and class assignments.  Nonetheless, the parties assumed that she did, and the District's IEP offers included such accommodations.

33.     During the SY 2005-2006, Student frequently failed to turn in homework and assignments on time, or at all.  She had done the same at Hillview Middle School.  Student's progress reports and IEP offers all record that she had consistent difficulties with the completion of homework in most of her classes, including science, math, history, biology, and social science.  The January 26 and November 3, 2006 IEP offers proposed to place Student in one period a day of individual work with the RSP teacher to work on study skills, to give her additional time to complete homework and assignments, and to pursue related goals and objectives.

34.     Student does not challenge the appropriateness of the goals and objectives concerning homework and assignments offered to her in the two proposed IEPs, nor does she question the potential value of the offered assistance from the RSP teacher.  Mother's stated reason for rejecting that assistance was only that she wanted to communicate directly with Student's teachers, not indirectly through the RSP teacher.  Why Mother could not

communicate directly with Student's teachers if Student spent one period with the RSP teacher was not explained.

35.    The goals, objectives, and RSP assistance proposed by the District to help Student with homework and study skills were reasonably calculated to afford educational benefit to Student and were appropriate.

36.    The undisputed evidence showed that, notwithstanding Mother's decision not to consent to any IEP offer, all of Student's teachers gave her the opportunity to make up late and missing homework and assignments.  Student rarely attempted to do so.

37.    To the extent that Student's poor grades were caused by late or missing homework and assignments, those grades either reflected Student's choice not to timely complete homework and assignments, or incorporated Student's low scores on the homework and assignments she did submit.  They also reflected the absence of assistance from the RSP teacher.

*Alleged Procedural Violations*

38.    A school district must ensure that the parents of a child eligible for special education are allowed to participate fully in the decision-making process regarding their child's education, and must consider the parents' views, and information provided by them, in developing an IEP proposal.

*Dissent letters*

39.    Student claims that the District significantly impeded Parents' opportunity to participate in the decisional process by refusing to include Parents' dissenting views in the IEP proposals and by refusing to respond to those views.  The evidence showed otherwise.

40.    On February 22, 2006, in response to the January 26 IEP meeting, Mother faxed to the District a letter dissenting from the District's proposal.  The next day the second of three IEP meetings was held.  The District's uncontradicted notes of that meeting stated that its purpose was "to review IEP documents and parents 'written dissent with the IEP' faxed this morning."  Those notes showed that the IEP team adequately considered, and responded directly to, the matters raised in the dissent letter.  For example, the letter demanded tutoring.  The IEP notes stated that Parents would receive the math tutorial schedule.  The letter demanded that Dr. Marone have access to the school.  The IEP notes stated that Parents would sign a form for the release of information to Dr. Marone.  The notes also stated that the IEP was revised, in unspecified ways, as a consequence of Parents' letter.  The letter was not attached to the IEP, as Mother demanded, but was placed in Student's file.

41.    After Mother and the District did not agree on an IEP on November 3, 2006, Mother sent to the District another letter of dissent, dated November 13.  That letter primarily reiterated the views expressed in the February 22 letter.  The IEP team, at its

November 3 meeting, considered and discussed the content of the February 22 letter. To the extent that the November 13 dissent letter echoed the February 22 dissent letter, the issues it raised were considered on November 3 by the IEP team.

42.    In her November 13, 2006 dissent letter, Mother raised some issues not raised in the February 22 letter. She demanded that the IEP offer specify exactly what services the RSP teacher would provide, and include a description of the exact length, setting, and amount of those services. However, mother had previously been adequately informed of the offered RSP services, which were described in the IEP offer as "time for homework completion and remediation of organizational skills." Given the nature of the RSP services, a more precise description of them was impracticable.

43.    The November 13, 2006 dissent letter also demanded that the IEP offer explain why additional evaluations of Student were sought. However, the requests for consent to assessments, the IEP documents themselves, and the testimony of District witnesses all showed that the District sought additional evaluations because of Student's increasing behavior problems, and had adequately communicated that reason to Mother.

44.    The November 13, 2006 dissent letter also demanded that the IEP confirm in writing "that the SUHS never received signed January 26th, 2006 IEP and Dissent letter dated February 21st, 2006." The reason for this demand is obscure. The District had received the February dissent letter and discussed it with Mother at IEP meetings on February 23 and November 3. Mother knew that the District never received a signed January 26, 2006 IEP because she never signed one. There was no reason for the IEP to contain this confirmation.

45.    There was nothing in the November 13, 2006 dissent letter that there was any reason to add to the November 3, 2006 IEP offer. Student did not prove that the District did not consider all of the letter's contents. The letter was placed in Student's file.

*Beginning dates, frequency, and duration of services*

46.    An IEP must state the beginning dates, frequency, and duration of offered services.

47.    Student's claim that the January 26 and November 3, 2006, IEP offers failed to state the beginning dates, frequency, and duration of offered services is baseless. Each IEP offer made those elements as clear as possible. The January 26 IEP, for example, offered Student 1475 minutes a week of general education teaching, 30 minutes a month consultation with a speech and language therapist, and 25 minutes a day with the RSP teacher. Only the proposal that Student retake D or F math tests is less than precise: in the column for frequency the offer states "as needed." Given the nature of the accommodation, the offer could not have been more specific. All the offered services were described as lasting for one year; the November 3 IEP offer was similarly precise. Documents accompanying the transmittal of both offers to Mother stated that the services would begin as soon as the

District received consent for them. Since Mother had never agreed to an IEP offered by the District, that was a reasonable way of describing the beginning dates of services offered.

*Lack of transition plans*

48.    Beginning not later than the IEP that will be in effect when a student receiving special education reaches 16 years of age (or younger, if the IEP team deems it appropriate), an IEP must include a transition plan that contains appropriate postsecondary goals relating to training, education, employment, and, where appropriate, independent living skills.

49.    Student was 13 years of age at the beginning of the SY 2005-2006. She was 15 on September 17, 2006, during which time the January 26, 2006 IEP offer would have been in effect if parents had consented to it. She will be 16 on September 17, 2007, during which time the November 3, 2006 IEP offer would be in effect if parents had consented to it.

50.    Student's contention that the January 26 and November 3 IEP offers do not contain transition plans is groundless. The January 26 offer contained a separate page entitled "IEP 1A TRANSITION SERVICES" that set forth a transition plan for Student. It was modest in detail, since the parties assumed Student, a ninth grader, would go to college. The transition plan proposed that Student visit the Career Center to explore college career interests, and that she visit the guidance counselor. The November 3, 2006 IEP offer contained an almost identical transition plan. Student does not challenge the sufficiency of these plans; she simply denies, incorrectly, that they exist in the IEP offers.

*Designation as triennial IEP*

50.    A school must reassess a special education student every three years unless the district and the parents agree in writing that the triennial reassessment is unnecessary.

51.    Student's argument that the January 26, 2006 IEP is not designated as the triennial IEP is untenable. The draft and final versions each contained a line entitled "Purpose of Meeting." In each instance the box marked "Triennial" was checked.

*Impact of alleged violations*

52.    Even if the District had violated procedural provisions of the IDEA, which it did not, the District's conduct did not impede Student's right to a FAPE, significantly impede Parents' opportunity to participate in the decision-making process, or cause a deprivation of educational benefits.

*Entitlement to relief*

53.    Based on the foregoing Factual Findings, Student is not entitled to relief, so it is not necessary to examine her proposed resolutions.[6]

## CONCLUSIONS OF LAW

*Elements of a FAPE*

1.    Under the IDEA and state law, children with disabilities have the right to free appropriate public education (FAPE). (20 U.S.C. § 1400(d); Ed. Code, § 56000.) FAPE means special education and related services that are available to the child at no charge to the parent or guardian, meet State educational standards, and conform to the child's IEP. (20 U.S.C. § 1401(a)(9).) "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(a)(29).) "Related services" are transportation and other developmental, corrective and supportive services as may be required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26).) In California, related services are called designated instruction and services (DIS), which must be provided if they may be required to assist the child in benefiting from special education. (Ed. Code, § 56363(a).)

2.    There are two parts to the legal analysis of a school district's compliance with the IDEA. First, the tribunal must determine whether the district has complied with the procedures set forth in the IDEA. (*Board of Educ. v. Rowley* (1982) 458 U.S. 176, 206-07.) Second, the tribunal must decide whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

3.    In *Rowley*, the Supreme Court held that the IDEA does not require school districts to provide special education students the best education available, or to provide instruction or services that maximize a student's abilities. (*Rowley, supra*, at p. 198.) School districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefit to the student. (*Id.* at p. 201.)

4.    Based on Factual Findings 1, 3, and 5-37, and Legal Conclusions 1-3, the District's January 26 and November 3, 2006 IEP offers adequately addressed all of Student's unique needs, to the extent that the District could obtain cooperation from parents. They were reasonably calculated to provide Student educational benefit. It is undisputed that the offers appropriately addressed Student's speech and language impairment. Aassistance from the RSP teacher in study skills and homework completion would have allowed her to improve her academic performance. The January 26 and November 3, 2006 IEP offers

---

[6]Although Student's proposed resolutions address the possibilities that the District might call the police about her, or wrongly suspend or expel her, Student did not pursue these issues at hearing.

constituted offers of a FAPE. The special education and services the District actually provided to Student from the beginning of SY 2005-2006 to November 13, 2006, under the terms of the March 5, 2004 IEP from Hillview Middle School, also constituted a FAPE. Student's low grades were not caused by any shortcoming in the District's delivery of curriculum to her.

*Behavioral Intervention Plan*

5.    If a child's behavior impedes her learning or that of others, an IEP team must consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a)(2)(i); Ed. Code, §§ 56341.1, subd. (b)(1), 56523.) One such intervention is with a behavioral support plan. Another involves a behavior intervention plan, a document that is developed when a student exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of her IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) A serious behavior problem is behavior that is self-injurious or assaultive, causes serious property damage, or is pervasive and maladaptive and not effectively controlled by the instructional and behavioral approaches specified in the student's IEP. (*Id.*, subd. 3001(aa).) The adoption of a behavior intervention plan must be preceded by a functional analysis assessment (FAA). The plan must, inter alia, summarize the relevant and determinative information gathered from the FAA. (*Id.*, subd. (f), § 3052.)

6.    Based on Factual Findings 3, 9-10, 12, and 22-28, and Conclusion of Law 5, Student's misbehavior required the IEP team to consider the use of positive behavior interventions and supports, and other strategies, and the IEP team did so, to the extent that parental consent could be obtained. The District was unable to develop a behavior support plan because Mother refused to allow Student to be interviewed about her behavior or to participate in the development of such a plan. The District was unable to investigate the possibility of a behavior intervention plan because Mother would not consent to an FAA or a mental health assessment. In any event, there was no evidence that Student's behavior was sufficiently serious to require a behavior intervention plan, and the District was not required to adopt one.

*Procedural Requirements*

  *Parental Participation in IEP Process*

7.    A parent is a required member of the IEP team. (20 U.S.C. § 1414(d)(1)(B)(i); 34 C.F.R. § 300.344(a)(1); Ed. Code, § 56341, subd. (b)(1).) The team must consider the concerns of the parents throughout the IEP process. (20 U.S.C. § 1414(c) (1)(B), (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. §§ 300.343(c)(2)(iii), 300.346(a)(1)(i), (b), 300.533 (a)(1)(i); Ed. Code, § 56341.1, subd. (a)(1), (d)(3), (e).) While the IEP team should work toward reaching a consensus, the school district has the ultimate responsibility to determine that the IEP offers a FAPE. (Appen. A to 34 C.F.R. part 300, Notice of Interpretation, 64 Fed. Reg. 12473 (Mar. 12, 1999).)

8.    A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693.) A parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way. (*Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1036.)

9.    Based on Factual Findings 39-53, and Legal Conclusions 7-8, Student's parents were not denied their right to participate in the decisional process regarding Student's educational program. Mother participated fully in every IEP meeting. She communicated her views to the rest of the IEP team, and those views were adequately considered and discussed at the IEP meetings on February 23 and November 3, 2006. It made no difference to the quality of Mother's participation in the process that the District placed her dissent letters in Student's file rather than attaching them to the IEP offers.

*Required contents of an IEP*

10.    An IEP must contain a statement of the child's present levels of educational performance; a statement of measurable annual goals; a statement of the "extent ... to which" a child will not participate in a regular classroom with nondisabled children; a statement of the special education and related services to be provided; and a statement of how the child's progress toward the annual goals will be measured. (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.347(a); Ed. Code, § 56345, subd. (a)(1), (2), (3).) A district must make a formal written offer in the IEP that clearly identifies the proposed program. (*Union Sch. Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526.)

11.    Federal and state law specify in detail what an IEP must contain. (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.347(a); Ed. Code, § 56345.) Those statutes may not be construed to require that something be contained in an IEP beyond that expressly required by the statutes themselves. (20 U.S.C. § 1414(d)(1)(A)(ii); Ed. Code, § 56345, subd. (i).) There is no requirement that an IEP contain any document offered by a parent.

12.    Based on Factual Findings 39-46, and Legal Conclusions 10-11, there was no reason for the District to attach Mother's dissent letters to the IEP offers, and no requirement that it do so. The parties were well aware of the contents of the dissent letters, which were considered and discussed. It made no difference that the letter was placed in Student's file rather than attached to the IEP offer.

*Beginning dates, frequency, and duration of services*

13.    An IEP must contain a projected date for the beginning of services and modifications, and the anticipated frequency and duration of those services. (20 U.S.C. § 1414(d)(1)(A)(i)(VII); 34 C.F.R. § 300.347(a)(6); Ed. Code, § 56345, subd. (a)(7).)

14

14.    A school district may not begin to deliver special education and related services until it obtains parental consent. (20 U.S.C. § 1414(a)(1)((D)(ii)(II); see, Ed. Code, § 56346.)

15.    Based on Factual Finding 47, and Legal Conclusions 13-14, the January 26 and November 3, 2006 IEP offers adequately set forth the projected dates for the beginning of offered services and modifications. The District was unable to describe those beginning dates more accurately than it did without parental consent, which it reasonably believed would not be granted. The IEP offers described the anticipated frequency and duration of the offered services with precision, except where precision was not possible due to the nature of the service or accommodation described, such as retaking tests.

*Transition plans*

16.    Beginning not later than the IEP that will be in effect when a student receiving special education reaches 16 years of age (or younger, if the IEP team deems it appropriate), an IEP must contain a transition plan that contains appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills. The plan must also contain the transition services needed to assist the pupil in reaching those goals. (34 C.F.R. § 300.320(b); Ed. Code, § 56345, subd. (a)(8)(A).)

17.    Based on Factual Findings 48-52, and Legal Conclusion 16, the January 26 and November 3, 2006 IEP offers contained appropriate transition plans. Although the content of those transition plans is limited, Student does not challenge their sufficiency. She only asserts that they do not exist in the IEP offers. They do.

*Triennial IEP*

18.    A child with a disability must be reevaluated not more frequently than once a year, unless a school district and a student's parents agree otherwise, and shall be reevaluated at least once every three years, unless the district and the parents agree in writing that a triennial reevaluation is unnecessary. (20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.536(b); Ed. Code, § 56381, subd. (a)(2).)

19.    Based on Factual Finding 51, and Legal Conclusion 18, the District conducted an adequate triennial reevaluation of Student and properly labeled its triennial review and IEP offer as such. The draft and final versions of the January 26, 2006 IEP offer contained check marks in the boxes used for designating the meeting as triennial. Mother was aware that the January 26 meeting was the triennial IEP meeting, and was not misled or misinformed in any way.

*Impact of alleged violations*

20.    In *Rowley*, the Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. (*Rowley, supra,* at pp. 205-06.) However, a procedural error does not automatically require a finding that a FAPE was denied. Since July 1, 2005, the IDEA has codified the pre-existing rule that a procedural violation results in a denial of a FAPE only if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process, or causes a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E)(ii); see, *W.G. v. Board of Trustees of Target Range School. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

21.    Based on Factual Findings 39-53, and Legal Conclusion 20, the District's conduct did not impede Student's right to a FAPE, significantly impede Parents' opportunity to participate in the decision-making process, or cause a deprivation of educational benefits. The District was fully aware of Mother's views, including those set forth in the dissent letters, and adequately discussed them with her. The IEP offers of January 26 and November 3, 2006, described the beginning dates, anticipated frequency, and duration of offered services as well as practicable. Mother knew that the offers required her consent before the services could be implemented, and was not misled or misinformed in any way.

*Burden of Proof*

22. Student, as the petitioner, has the burden of proving the essential elements of her claim. (*Schaffer v. Weast* (2005) 546 U.S. 49.)

23.    Based on Factual Findings 1-54 and Legal Conclusions 1-22, Student did not discharge her burden of proving that she was denied a FAPE.


ORDER

For the foregoing reasons, Petitioner's requests are denied.


PREVAILING PARTY

Education Code section 56507, subdivision (d) requires this decision to indicate the extent to which each party prevailed on each issue heard and decided. The District prevailed on all issues.

16

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction.  If an appeal is made, it must be made within 90 days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated:  February 23, 2007

CHARLES MARSON
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

17

## PROOF OF SERVICE

I, **Rosie Ruiz**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**2349 Gateway Oaks, Suite 200**
**Sacramento, CA 95833-4231**

On **February 23, 2007**, I served a copy of the following entitled action:

### DECISION - OAH CASE NO. - 2006120087

to each of the person(s) named below, at the address set out next to each name, by the following method:

Milford & Noria Zasslow
1730 Bay Laurel Drive
Menlo Park, CA 94025

John D Nibbelin, Esq.
Attorney at Law
400 County Center, 6th Floor
Redwood City, CA 94063

☒ **US MAIL** — by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

<u>XX  Regular Mail</u>

☐ **FACSIMILE TRANSMISSION** — by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number , pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at

**9:41 AM** on the **23** of **February**, 2007. 
Rosie Ruiz

**EXHIBIT B**

*CEM* ✓
*JDN* ✓

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the matter of:

SEQUOIA UNION HIGH SCHOOL
DISTRICT,

                Petitioner.

vs.

STUDENT,

                Respondent.

CASE NO. N2006050687

## DECISION

Debra R. Huston, Administrative Law Judge (ALJ) for the Office of Administrative Hearings (OAH), Special Education Division, State of California, presided over the due process hearing on June 16, 2006, in Woodside, California.

Sequoia Union High School District (District) was represented at the hearing by attorney John D. Nibbelin. Also present at the hearing on behalf of District were Joyce Willett, Director of Special Education; Margaret Williams, Instructional Vice President of Woodside High School; and Katie Landman, law clerk to Mr. Nibbelin.

Student, who was not present at the hearing, was represented by her Mother.

Oral and documentary evidence were received and arguments were presented. The record was held open to allow the parties to file briefs by June 23, 2006. District filed briefing on June 19, 2006. Student did not file a closing brief. The record was closed on June 23, 2006.

ISSUE

Whether the assessment of Student performed by District and completed in January 2006 was appropriate.

FACTUAL FINDINGS

*Background Facts*

1.      On May 18, 2006, District filed a request for a due process hearing for a determination as to whether the assessment prepared by District personnel in connection with Student's triennial evaluation was appropriate.[1]

2.      Student is 14 years of age, and was a freshman at Woodside High School, which is within District, on the date on which District filed its request. Prior to attending Woodside High School, Student attended school within the Menlo Park City School District. Student has had an individualized education program (IEP) since kindergarten, with speech and language as her category of eligibility.

3.      A transition meeting was held in June 2005 before Student left the eighth grade at Hillview Middle School, located within the Menlo Park City School District. It was Student's parents' intention that she attend Woodside High School the following year and, therefore, personnel from Woodside High School were present at that transition meeting. At the meeting, concern was expressed about Student possibly not graduating from Hillview, and also about behaviors she was exhibiting in her classes. There was discussion about whether behavior services for Student should continue at Woodside High School the next school year. It was determined that Student would have resource teacher services at Woodside High School. A transition plan was sent home, but Student's mother did not sign it.

4.      The last IEP signed by Student's parents was in 2004, and District wanted to evaluate Student's needs in order to agree on an IEP. Ms. Karen McGee, school psychologist at Woodside High School, was responsible for coordinating the triennial assessment of Student. Ms. McGee had a number of phone conferences with Mother, who agreed to an assessment of Student. On November 22, 2005, Ms. McGee sent to Mother an assessment plan form explaining what assessments might be conducted to aid in the development of a triennial IEP. All areas of assessment were checked on the form, including assessments in the areas of academic achievement, intellectual development, communication development, social/adaptive behavior, psycho-motor development, alternative assessment measures, and "other", which included, as appropriate, health and development, vision, hearing, orientation and mobility skills, career and vocational abilities and interests, self-help, and functional analysis.

---

[1] On March 3, 2006, Student filed a due process complaint (OAH No. N2006030104). That complaint was dismissed on May 18, 2006, and the case was closed on that date.

2

5.      The form was returned, signed by Mother on November 23, 2005, with lines drawn through assessments in the areas of psycho-motor development, alternative assessment measures, and "other". Mother testified these areas were crossed out when she received the form. Ms. McGee testified that she believes Mother crossed those out. The boxes that corresponded to the three lines that were crossed out were checked, as Ms. McGee testified. Thus, Ms. McGee's testimony is more credible in this regard.

6.      Student was administered a triennial assessment by District personnel during November and December 2005 and January 2006, consisting of a speech and language assessment, a psychoeducational evaluation, and an academic assessment. The assessment was consistent with and based on the assessment plan described in Factual Finding Numbers 4 and 5, *supra*, and was a multi-disciplinary assessment. All tests were conducted in English. The assessments were completed by, and presented at, the January 26, 2006, IEP meeting.

*Speech and Language Assessment*

7.      Ms. Marian Welch, a speech and language therapist at Woodside High School for the past 18 years, conducted the speech and language assessment and prepared the speech and language assessment report. Ms. Welch possesses the required credential to work as a speech and language specialist in California schools in that she holds a clinical or rehabilitative services credential. In addition, Ms. Welch holds two other credentials, including a clinical rehabilitation service credential with classroom authorization and a pupil personnel service credential. Ms. Welch also holds several certificates of training in her field. Ms. Welch holds a bachelor of science degree in communication disorders from Emerson College and a master of science in education from Suffolk University. Ms. Welch was qualified to administer the speech and language assessment to Student.

8.      Ms. Welch evaluated Student's general language functioning, including receptive language, expressive language, vocabulary, and critical thinking ability as it relates to problem solving, and pragmatic language.[2]

9.      Ms. Welch focused on these areas because of background information she reviewed regarding Student. Ms. Welch had reviewed Student's file from the school district Student attended before attending Woodside High School, Ms. Welch pulled Student's record and saw her quarter grades at Woodside High School, and Ms. Welch also talked with Ms. McGee and Carole Grabiec, resource teacher at Woodside High School. Ms. Grabiec was in touch with Student's classroom teachers, and there were reports by those teachers of Student not getting homework done and subsequently not performing well on tests. Ms. Welch reviewed Student's file in the school psychologist's office and went over her former IEPs and some of the assessments contained in the IEPs. Also, Student's records from

---

[2] Language pragmatics means the ability to connect with another person, to interact, to use nonverbal language, to stay on topic, to provide relevant responses, and to use appropriate voice level and eye contact.

seventh and eighth grades showed problems with social pragmatics in the classroom. Ms. Welch spoke with Student's French teacher, who told Ms. Welch that while Student was performing average work in class, there was some concern with behavior. For example, Student was arriving late to class and not settling down in class.

10.     Ms. Welch used several testing instruments with Student, including the Adolescent Word Test, the Adolescent Test of Problem Solving, and the Clinical Evaluation of Language Fundaments IV (CELF IV). These instruments are all valid instruments, meaning that the instruments measure what they purport to measure. Ms. Welch has received training on the proper administration of these instruments, and she administered each of these instruments to Student in accordance with its instructions. Ms. Welch has been using speech and language instruments to assess students for 20 years. Ms. Welch also observed Student's communicative style to evaluate Student's social pragmatic language.

11.     The Adolescent Word Test was used to evaluate Student's vocabulary and her ability to apply her vocabulary. Student performed in the average to above-average range on this test.

12.     The Adolescent Test of Problem Solving was used to evaluate Student's critical thinking skills. The test examines critical thinking skills in problematic social contexts, such as one's ability to see situations from the perspective of others. Ms. Welch administered this test to Student because of her history of problems with resolving issues with others. Student's score on this test, which was in the 83rd percentile rank, indicates a good ability to use language to reason and voice solutions to pragmatic language situations and resolve problems in "pragmatic situations".

13.     Ms. Welch administered the CELF IV to test Student's receptive and expressive language. Ms. Welch administered four of the core subtests of the CELF IV. A score of 100 represents the performance of a typical student. Student received a Core Language Score of 117 and an Expressive Language Index of 114. Student's score on one subtest, recalling sentences, was low, with a percentile rank of 16, but this score would not red flag a problem, in Ms. Welch's opinion, because this subtest requires perfect recall of sentences, which is something people do not do in everyday life. Although Student could not recall some words correctly, the test showed that she understood the gist of the sentences. Student's score for formulating sentences was in the percentile rank of 91, between the 92nd and 98th percentile ranks on the test of word classes, and in the percentile rank of 95 for word definitions. Administration of the CELF IV requires that Ms. Welch give four core subtests, and if there is any "red flagging", she would go on to other tests. There were no red flags in Student's case. Student has strengths in the areas of, and the ability to use, expressive and receptive language. She also has a good vocabulary. In other words, she understands spoken language and can use it to express herself.

14.    The speech and language tests administered by Ms. Welch were appropriate. The use of these assessment tools provided Ms. Welch with enough information to determine Student's needs and were adequate to determine what services were needed. Assessment was not needed in other areas.

*Psychoeducational Evaluation*

15.    Ms. Karen McGee, school psychologist at Woodside High School since 1989, conducted the psychoeducational evaluation and prepared the psychoeducational evaluation assessment report  Ms. McGee holds a pupil personnel services credential with a specialization in school psychology, and two other credentials as well, including a designated services credential in standard secondary education and a pupil personnel services credential with specialization in counseling. Ms. McGee is a nationally certified school psychologist. Ms. McGee holds a bachelor's degree and two master's degrees from Stanford University, and has undertaken study relating to her profession at other universities as well. Ms. McGee is now a doctoral candidate at the University of San Francisco. Ms. McGee was qualified to administer the psychoeducational evaluation to Student, and to coordinate District's assessment of Student.

16.    Ms. McGee had a number of phone conversations and email exchanges with Student's mother in the fall of 2005, during which Mother and Ms. McGee discussed areas of concern regarding Student. Mother expressed concern about Student's academic progress. Mother also wanted a psychologist to go to the school and observe Student and, therefore, Ms. McGee had reason to assume that Student had social/emotional issues.

17.    Ms. McGee's assessment process also included an extensive record review. Ms. McGee reviewed Student's "psych" file, which includes all psychological reports, speech and language reports, and behavior reports. Ms. McGee also reviewed Student's cumulative file and reports of her then-current teachers, had discussions with Ms. Welch and Ms. Grabiec, and read emails from Student's teachers to Ms. Grabiec. Ms. McGee also spoke with Mother regarding concerns about behavior to determine if behavior services should be provided to Student. Ms. McGee also reviewed Student's academic progress and observed Student in class and on the school grounds during breaks. On a couple occasions, when McGee observed Student, Student was alone. On another occasion, Student was skipping on school grounds with two other girls.

18.    Student's areas of suspected disability included speech and language impairment, and there were concerns about her academic progress. Ms. McGee also considered the possibility of a specific learning disability, severe emotional disturbance, and autism.

19.    Ms. McGee administered a number of testing instruments to Student, including the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV), the Incomplete Sentences Blank, the Draw-a-Person, and portions of the Behavior Assessment System for Children – Self Report (BASC). Ms. McGee has received training with respect to the proper

administration of these testing measures, the testing instruments are valid, and Ms. McGee administered these tests to Student in accordance with the instructions. Ms. McGee also conducted a personal interview of Student.

20.     The WISC-IV is a standard instrument of established validity across the country. This test measures verbal and performance IQ, and is used to determine if processing problems are present. Student was found to have average verbal and performance processing, meaning she is in the 64 percent of the population who can perform commensurate with age. Student has the ability to do what she wants to do academically. Student's artistic ability is in the gifted range, although her drawing indicated a defensive stance against others.

21.     Student invalidated several areas of the BASC by giving the same answer to successive questions, although Ms. McGee still did not see indicators of emotional disturbance in the "significant" portion of the scale. Student reported a high level of anxiety and feelings of isolation from peers, although she does have strategies for relating to peers. The BASC revealed that Student is very independent minded and self reliant, and has a distrust for adults. Student likes fencing, singing, and writing lyrics. Student indicated a lack of social awareness by singing for an hour to Ms. McGee one day, which is an unusual thing for a person to do in the presence of an adult the child does not trust.

22.     The assessment measures administered by Ms. McGee were appropriate, and Ms. McGee properly ensured that Student was assessed in all areas of suspected disability.

*Academic Assessment*

23.     Ms. Carole Grabiec, resource teacher at Woodside High School for 21 years, conducted the academic assessment and prepared the assessment report. Ms. Grebiec holds a credential as a resource specialist, learning handicapped, standard education (secondary). Ms. Grabiec has an extensive educational background relating to her work, has participated in ongoing training and development with respect to her work and the administration of academic assessments, and has been the recipient of numerous awards in her field. Ms. Grabiec was qualified to administer the academic assessment to Student.

24.     Ms. Grabiec read a number of reports regarding Student, and also reviewed Student's cumulative file. Ms. Grabiec looked at Student's work from her English class. She also spoke with Ms. Welch and Ms. McGee and read the reports of teachers. Those reports from teachers addressed Student's lack of work. According to teachers, Student would do art projects and play video games in class, rather than perform class work. Except for Student's geometry teacher's report, Student's teachers' reports did not address a lack of ability on Student's part to do the work. The teachers also reported that Student was not turning in homework.

6

25.    Ms. Grabiec assessed Student using the Woodcock-Johnson III Tests of Achievement, which is a valid test. Ms. Grabiec has been trained with respect to how to administer the tests, and she followed all requirements and instructions in the administration of the tests to Student. Student was cooperative and focused during the tests, and Ms. Grabeic believes the scores are valid.

26.    According to Ms. Grabiec, Student has excellent fluency under time constraints, good decoding skills, and good language skills. Student's broad math was on grade level, and Student has the ability to pass math classes and the high school exit exam.

27.    Student's scores in the area of passage comprehension and picture vocabulary were low. Student made major grammatical errors in her writing samples, so writing was included as a goal in the IEP that was later developed.

28.    The assessments administered by Ms. Grabiec were appropriate.

## LEGAL CONCLUSIONS

*Applicable Law*

1.    Pursuant to California special education law, the Individuals with Disabilities in Education Act (IDEA), and, effective July 1, 2005, the Individuals with Disabilities in Education Improvement Act (IDEIA), children with disabilities have the right to a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (20 U.S.C. §§ 1400(c), 1414(d); Ed. Code § 56000.) Before any action is taken with respect to the initial placement of an individual with exceptional needs, an assessment of the pupil's educational needs shall be conducted. (Ed. Code § 56320.) Thereafter, special education students must be reassessed every three years or more frequently, if conditions warrant, or if the pupil's parent or teacher requests a new assessment and that a new IEP be developed. (20 U.S.C. § 1414(a)(2); Ed. Code § 56381.) The student must be assessed in all areas related to his or her suspected disability, and no single procedure may be used as the sole criterion for determining whether the student has a disability or an appropriate educational program for the student. (20 U.S.C. § 1414(b)(2); Ed. Code § 56320, subd. (e), (f).) Tests and assessment materials must be administered by trained personnel in conformance with the instructions provided by the producer of such tests. (20 U.S.C. § 1414(b)(2), (3); Ed. Code §56320, subd. (a), (b).)

2. Assessments must be conducted by individuals who are both knowledgeable of the student's disability and competent to perform the assessment, as determined by the school district, county office, or special education local plan area. (Ed. Code §§ 56320, subd. (g), 56322; see 20 U.S.C. § 1414(b)(3)(B)(ii).) A psychological assessment must be performed by a credentialed school psychologist. (Ed. Code § 56324.) Tests and assessment materials must be validated for the specific purpose for which they are used; must be selected and

administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's primary language or other mode of communication, or in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless this is clearly not feasible.  (20 U.S.C. § 1414(b)(2), (3); Ed. Code § 56320, subd. (a), (b).)

3.  Among the procedural safeguards provided to parents under the IDEA, parents have a right to obtain an independent educational evaluation (IEE) of the child.  California law provides that when a parent disagrees with an assessment obtained by the public educational agency, the parent has the right to an IEE from qualified specialists at public expense unless the educational agency is able to demonstrate at a due process hearing that its assessment was appropriate, in accordance with Section 300.502 of Title 34 of the Code of Federal Regulations.  (Ed. Code § 56329, subd. (b); 34 C.F.R. § 300.502(b).)

4.  The petitioner in a special education administrative hearing has the burden to prove his or her contentions at the hearing.  (*Schaffer v. Weast* (2005) 546 U.S. ____ [126 S.Ct. 528].)

*Discussion*

Based on Factual Findings Numbers 6 to 28, inclusive, District's multi-disciplinary assessment of Student, consisting of a speech and language assessment, a psychoeducational evaluation, and an academic assessment, was appropriate, in accordance with the requirements of Education Code section 56329, subdivision (b), and Section 300.502(b) of Title 34 of the Code of Federal Regulations.  Student was assessed in accordance with the assessment plan.  District personnel who assessed Student were well-qualified and competent to perform the assessments, were trained in the use of the testing instruments they used, and used the instruments in conformity with the applicable instructions.  District personnel who assessed Student were knowledgeable of Student's previously diagnosed disability, conducted a thorough background review of Student's records, and used a variety of validated instruments in assessing Student to determine whether Student has a disability and, if so, to determine an appropriate educational program for Student.

ORDER

The assessment conducted by District was appropriate.

PREVAILING PARTY

The following findings are made in accordance with this California Education Code section 56507, subdivision (d):  The District prevailed on the issue heard.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety days of receipt of this decision. (Cal. Ed. Code § 56505, subd. (k).)

July 30, 2006

Debra R. Huston
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

9

## PROOF OF SERVICE

I, **Rosie Ruiz**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**1102 Q Street, 4th Floor**
**Sacramento, CA 95814**

On **June 30, 2006**, I served a copy of the following entitled action:

### DECISION - OAH CASE NO. - 2006050687

to each of the person(s) named below, at the address set out next to each name, by the following method:

Milford And Nora Zasslow
1730 Bay Laurel Drive
Menlo Park, CA 94025

John D. Nibbelin, Esq.
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA 94063

☒ **US MAIL** — by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

  XX  Regular Mail

☐ **FACSIMILE TRANSMISSION** — by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number (916) 322-8014, pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at **4:13 PM** on the **30** of **June**, 2006. _____ Rosie Ruiz

**EXHIBIT C**

Timothy J. Walton  (State Bar No. 184292)
WALTON & ROESS LLP
407 South California Avenue
Suite 8
Palo Alto, CA 93406
Phone: (650) 566-8500
Fax: (650) 618-8687
Email: SarahZ@netatty.com

Attorneys for Plaintiff
SARAH Z.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO DIVISION)

| | |
|---|---|
| SARAH Z.,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SEQUOIA UNION HIGH SCHOOL DISTRICT, PATRICK GEMMA, NIKKI WASHINGTON, CLIFF ALIRE, KAREN MCGEE, MARIAN WELCH, OFFICE OF ADMINISTRATIVE HEARINGS and DOES 1-5,<br><br>　　　　Defendants. | Case No.: C 07-2389 JL<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**[20 U.S.C. § 1400 et seq.]**<br>**[42 U.S.C. § 1983]**<br><br>　**1. Individuals with Disabilities Education Act**<br>　**2. Deprivation of Rights Under Color of Authority**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE** |

### I. INTRODUCTION

1. This is a civil action for declaratory relief, equitable relief, and for compensatory damages to redress deprivation of Plaintiff's rights, including the right to a "free appropriate public education" ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), as well as civil rights enjoyed by every citizen of the United States.

## II. JURISDICTION

2. This Court has jurisdiction pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(3), 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## III. INTRADISTRICT ASSIGNMENT

3. Events giving rise to this complaint occurred in San Mateo County in the State of California, which is within the San Francisco division of the Northern District of California.

## IV. THE PARTIES

4. Plaintiff SARAH Z. is a minor attending high school.

5. Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT is the entity responsible for providing Plaintiff SARAH Z. with an education.

6. Defendant PATRICK GEMMA is the superintendent of Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT.

7. Defendant NIKKI WASHINGTON is the chief administrator of special education for Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT.

8. Defendant CLIFF ALIRE is the vice principal of Sequoia Union High School.

9. Defendant KAREN MCGEE is a psychologist working for Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT.

10. Defendant MARIAN WELCH is a speech therapist employed by Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT

11. Defendant OFFICE OF ADMINISTRATIVE HEARINGS is a quasi-judicial tribunal established by the California Legislature.

12. Plaintiff does not know the true names or legal capacities of the defendants sued herein as DOES 1 through 100, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated

2

herein as a DOE is legally responsible in some manner for the matters herein alleged, and is legally responsible in some manner for causing the injuries and damages to Plaintiff as alleged herein.

### V. ALLEGATIONS

13. The term "free appropriate public education" ("FAPE") means special education and related services that are available to the student at no cost to the parents, that meet the State educational standards, and that conform to the student's Individual Education Plan ("IEP").  (20 U.S.C. § 1401(9).)

14. Under the federal IDEA and state law, students with disabilities have the right to a FAPE. (20 U.S.C. § 1400, et seq.; Cal. Ed. Code § 56000, et seq.)

15. "Special education" is defined as specially designed instruction, at no cost to parents, to meet the unique needs of the student.  (20 U.S.C. § 1401(29).)

16. The term "related services" includes transportation and other developmental, corrective, and supportive services as may be required to assist a child to benefit from special education.  (20 U.S.C. § 1401(26).)

17. Once a child is identified under the IDEA as disabled, the local education agency must identify the unique educational needs of that child by appropriate assessment, create annual goals and short-term benchmarks to meet those needs, and determine specific services to be provided. (Cal. Ed. Code §§56300-56302; 20 U.S.C. § 1412.)

18. A school district must offer a student eligible for special education an Intervention Education Plan ("IEP") that is reasonably calculated for educational benefit.

19. An IEP must state the beginning dates, frequency, and duration of offered services.

20. Every school district must have a triennial IEP for each of its students in special education.

21. An IEP must include a transition plan that contains appropriate postsecondary goals.

### V. STATEMENT OF FACTS

22. Plaintiff, a fifteen year old female student, is eligible for special education because of a speech and language impairment.

23. In order to benefit from educational opportunities, Plaintiff requires additional assistance because of her disability.

24. Plaintiff's disability also causes her to experience frustration, which manifests in behavioral problems.

25. Plaintiff has been receiving low and failing grades since entering high school within the district of Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT ("the District").

26. Plaintiffs parents believe that Plaintiff's poor grades are a result of Defendant's failure to provide services.

27. Plaintiff has a Behavior Intervention Plan that was developed on December 1, 2003, and revised in January, 2005.

28. Dr. Frank Marone, hired by the District, supervised and provided behavioral services to student from Kindergarten to 8th grade.

29. The last IEP that was agreed to was in March 2004, when Plaintiff was in middle school.

30. Plaintiff had a Triennial IEP on January 26, 2006, at which they discussed Plaintiff's needs.

31. Plaintiff was found eligible for special education under "speech and language impairment" at the IEP that took place on January 26, 2006.

32. As a result of the meeting, Defendant sent an IEP proposal to Plaintiff's parents on February 16, 2006.

33. The IEP offer dated January 26, 2006, was sent by the District via US mail and received by Plaintiff's parents on February 16, 2006.

34. A notarized dissent letter was sent to Defendant via US certified return receipt mail on February 21, 2006, and again on February 23, 2006.

35. Plaintiff faxed the dissent letter dated Feb 21, 2006 to the Defendant District care of Defendant MCGEE and another employee of the District on February 23, 2006.

36. In the dissent letter, parents consented to retaking of tests in math where Plaintiff received a D or F and speech therapy for 30 minutes. Parents rejected evaluation from the school psychologist and Resource Specialist Program ("RSP") teacher services. Parents requested additional services in the form of the opportunity to retake tests in Science, English, French, and

4

1  Social Studies as needed for low grades, the opportunity to redo homework in which Plaintiff

2  does poorly, the opportunity to complete late or missed homework, attend summer school and 3

3  hours of tutoring per week in math and science. Also, the parents requested Defendant allow Dr.

4  Frank Marone, who has worked with Plaintiff for a number of years, to attend hearings and

5  observe the student at school. In addition, parents requested that Defendant obtain consent prior

6  to changing Plaintiff's program, honor the stay put provisions, and provide behavior consultation

7  and services by a licensed behaviorist.

8  37. Defendant would not agree to the parental requests.

9  38. The March 2004 IEP remained in effect.

10  39. At an IEP meeting on November 3, 2006, Defendant offered Plaintiff substantially the same

11  program offered in January with a few additions.

12  40. The IEP that took place on November 3, 2006, was interrupted by the District's counsel to

13  fax parents a document entitled "Procedural Safeguard Notice".

14  41. On November 13, 2006, Parents consented to retaking tests in math where Plaintiff received

15  a D or F, speech therapy for 30 minutes, preferential seating and extended time on tests and

16  assignments. Parents asked for further information on the Resource Specialist Program ("RSP")

17  before agreeing to allow it into the IEP. Parents requested additional services in the form of the

18  opportunity to retake tests in Science, English, French, and Social Studies as needed for low

19  grades, the opportunity to redo homework in which Plaintiff does poorly, the opportunity to

20  complete late or missed homework, attend summer school and 3 hours of tutoring per week in

21  math and science if Plaintiff received a low grade. Also, Plaintiff's parents requested Defendant

22  to allow Dr. Frank Marone, who has worked with Plaintiff for a number of years, to attend

23  hearings and observe the student at school. In addition, parents requested that the school district

24  obtain consent prior to changing Plaintiff's program and honor the provisions of the last agreed-

25  upon IEP.

26  42. Defendant failed to act on the parent request, or reply at all in writing, so the March 2004 IEP

27  continued in effect.

28

5

Plaintiff's First Amended Complaint For Damages,
Declaratory And Injunctive Relief

43. Defendants significantly impeded Plaintiff's opportunity to participate in the decisional process by refusing to include her parents' dissenting views in the IEP documents.

44. Each IEP offer failed to state the beginning dates, frequency, and duration of services.

45. None of the IEP offers contained a valid transition plan.

46. Defendant failed to perform its obligation of providing requisite educational opportunities to meet the needs of the Plaintiff.

47. Defendant also failed to discharge its obligation to provide highly qualified service providers, such as an appropriately trained and credentialed speech therapist.

48. The District representative at IEPs was Defendant KAREN MCGEE. She refused to honor "stay put", wrote an incomplete psychological evaluation, and is not certified by the National Board of Psychology or the California Board of Psychology.

49. Defendant CLIFF ALIRE testified at the due process hearing that he didn't know Plaintiff was a special education student or that she had an IEP or Behavioral Intervention Plan. He refused to protect Plaintiff when she asked for help when she was being harassed by other students. Defendant ALIRE violated the Behavioral Intervention Plan by inviting law enforcement officials on campus without following the Behavioral Intervention Plan.

50. Defendant NIKKI WASHINGTON refused to honor "stay put". Her IEP documents failed to conform to statutory guidelines. She received the IEP dissent letter from Plaintiff's parents, but denied that she received it and refused to make it part of the IEP.

51. Plaintiff filed a request for a due process hearing that was received by the OFFICE OF ADMINISTRATIVE HEARINGS ("The OAH") on December 4, 2006.

52. The OAH scheduled the Due Process Hearing for February 1, 2007, more than 45 days after the request.

53. The OAH never sent notice of a pre-hearing conference. The OAH called on the morning of January 29, 2007, to inform Plaintiff's parent of a pre-hearing conference to commence immediately. Plaintiff's parent was compelled to attend the pre-hearing conference without preparation or prior notice.

Plaintiff's First Amended Complaint For Damages,
Declaratory And Injunctive Relief

54. Plaintiff's mother sent a fax on January 29, 2007, asking for information about the hearing date and the scheduling of the pre-hearing conference, but her request was ignored.

55. The OAH denied parent the opportunity to subpoena a witness, Defendant PATRICK GEMMA.

56. During the due process hearing, Defendant's psychologist, Defendant MCGEE, admitted that she was not certified by the California Board of Psychology or National Board of Psychology.

57. Defendant MCGEE also testified that she could not respond to a dissent letter prior to having a signed IEP. She also testified that the District could not implement any portion of an IEP unless the parents agreed in full to the District offer.

58. Defendant CLIFF ALIRE stated at the due process hearing, "I found out that Sarah was a special ed [sic] student and that she had an IEP on November 3, 2006 [date of her last IEP, at which he appeared]".

59. Sarah received and is still receiving tutoring services from "Academic Trainers" in Menlo Park.

### FIRST CAUSE OF ACTION

#### (Violations of the Individuals with Disabilities Education Act)

#### (Against Defendants SEQUOIA UNION HIGH SCHOOL DISTRICT and DOES 1-5)

60. Plaintiff realleges and incorporates by reference paragraphs 1 through 59 above.

61. Defendant has violated Plaintiff's rights by failing to provide a "free appropriate public education" ("FAPE") as required by federal and California state law.

62. Defendant denied Plaintiff a FAPE by failing to provide individual tutoring in math and science.

63. Defendant denied Plaintiff a FAPE by failing to adopt and follow a behavior intervention plan.

64. Defendant denied Plaintiff a FAPE by failing to offer a transition plan.

65. Defendant denied Plaintiff a FAPE by failing to state in an Individual Education Plan ("IEP") documents the beginning dates, frequency, and duration of offered services.

7

66. Defendant denied Plaintiff a FAPE by refusing to comply with the stay-put requirement while drafting a new IEP.

67. Defendant denied Plaintiff a FAPE by failing to provide prior written notice when initiating, changing or refusing identification, evaluation, educational placement of provision of FAPE.

68. Defendant denied Plaintiff a FAPE by failing to answer in writing specific written queries by parents.

69. Defendant denied Plaintiff a FAPE by failing to provide all services provided in IEP.

70. Defendant denied Plaintiff a FAPE by failing to provide services provided in an individual setting.

71. Defendant denied Plaintiff a FAPE by failing to provide highly qualified service providers.

72. Defendant denied Plaintiff a FAPE by refusing to allow opportunities to retake tests or resubmit late or missing homework.

73. Defendant denied Plaintiff a FAPE by failing to include parents' statements in the IEP.

74. Defendant denied Plaintiff a FAPE by failure to meet goals.

75. Defendant violated Plaintiff's rights by denying procedural due process as required by federal and California state law.

76. As a result of Defendant's refusal to provide FAPE, Plaintiff has been damaged under the law.

WHEREFORE, Plaintiff prays for judgment against Defendant as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Deprivation of Rights Under Color of Authority)

### (Against Defendants PATRICK GEMMA, NIKKI WASHINGTON, CLIFF ALIRE, KAREN MCGEE, MARIAN WELCH, OFFICE OF ADMINISTRATIVE HEARINGS and DOES 6-10)

77. Plaintiff realleges and incorporates by reference paragraphs 1 through 59 above.

78. Plaintiff is a citizen of the United States of America with rights as a citizen under federal law.

79. Congress intended that its laws would protect Plaintiff and other citizens similarly situated.

80. The right to sue is consistent with the statutory purpose of the IDEA.

8

81. Plaintiff's cause of action is not traditionally relegated to the states.

82. Procedural due process and substantive due process are rights unambiguously conferred by the federal Constitution.

83. Defendant's policies, practices and customs discriminate with deliberate indifference to the rights of disabled Americans.

84. As a result of Defendant's deprivation of her rights, Plaintiff has been damaged under the law.

WHEREFORE, Plaintiff prays for judgment against Defendant as hereinafter set forth.

## V. PRAYER FOR RELIEF

A.  Equitable relief in the form of an injunction requiring Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT to provide compensatory education;

B.  Equitable relief in the form of an injunction requiring Defendant SEQUOIA UNION HIGH SCHOOL DISTRICT to provide procedural due process;

C.  Declaratory relief in the form of a judgment that Plaintiff SARAH Z. has been denied a free appropriate education;

D.  Declaratory relief in the form of a judgment that Plaintiff has been denied procedural due process;

E.  Damages in an amount determined by the Court;

F.  Attorneys' fees and costs of suit, as allowed by law; and

G.  Such other and further relief as the Court deems proper.

DATED: June 11, 2007                         WALTON & ROESS LLP

                                             BY: /s/ Timothy J. Walton
                                             TIMOTHY J. WALTON
                                             Attorneys for the Plaintiff

9

1

DEMAND FOR JURY TRIAL

2

Plaintiff demands a jury trial as provided in Federal Rule of Civil Procedure § 38(b).

3

DATED: June 11, 2007                                    WALTON & ROESS LLP

4

5

BY: /s/ Timothy J. Walton
6
TIMOTHY J. WALTON
Attorneys for the Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10